**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Hershel D. MURVINE, Defendant-Appellant.**

**No. 83–2675.**

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1984.

Decided Sept. 6, 1984.

Rehearing and Rehearing In Banc Denied Oct. 3, 1984.

John F. Hoehner, Asst. U.S. Atty., R. Lawrence Steele, Jr., U.S. Atty., Hammond, Ind., for plaintiff-appellee.

George B. Collins, Collins & Amos, Chicago, Ill., for defendant-appellant.

Before POSNER and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.*

FLAUM, Circuit Judge.

This is an appeal from the defendant's convictions of conspiracy to possess and dispose of goods stolen from interstate shipments and to transport those goods in interstate commerce, and of possession and interstate transportation of goods stolen from interstate shipments. For the reasons set forth below, we affirm.

On February 23, 1982, five coils of stainless steel, valued at $43,997, were stolen from a freight truck parked outside a restaurant in Hammond, Indiana. William Kramer acquired the coils on February 26, after being informed that they were stolen. Kramer then contacted the defendant, who instructed Kramer to ship the coils to a plant near Chicago, Illinois. Within the following month, the defendant was successful in his attempts to locate a purchaser for the coils, and he sold the coils to Theodore Salmon on March 22, 1982.

Shortly after the sale of the steel coils, Salmon notified the Federal Bureau of Investigation (FBI) of his suspicions that the coils were stolen. The FBI questioned Kramer, who initially denied any wrongdoing but then agreed to cooperate as a confidential informant of the FBI.

In June 1982, Kramer engaged in another sale of stolen steel without the FBI's knowledge, although he continued to cooperate with the FBI on other matters. In the June transaction, Kramer came into possession of three stainless steel coils, valued at $36,515, which had been stolen in Toledo, Ohio. Kramer contacted the defendant, who directed Kramer to have the coils shipped to a warehouse in Chicago. After delivery of the coils, the defendant arranged through James Magnus to sell the coils to Envoy Stainless Steel Company. On July 14, 1982, a representative of Envoy met with the defendant, who was using the name "Robert Martin." At the end of the meeting, the Envoy representative paid the defendant $32,925 for the coils.

A grand jury indicted both the defendant and Magnus on March 18, 1983, charging them with conspiracy to possess and dispose of stolen goods and to transport these goods in interstate commerce, and with possession and interstate transportation of the steel coils stolen in June 1982. The grand jury also charged the defendant, but not Magnus, with possession and interstate transportation of the coils stolen in February 1982. Although the defendant and Magnus were to be tried together, the district court granted a severance on the morning of July 18, 1983, the first scheduled day of trial. The court announced that the defendant's trial would proceed, but Magnus's trial would begin on the following Monday.

The government presented its case against the defendant for four and one-half days. On Friday, July 22, the government finished presenting its evidence during the morning session, which began at 9:15 a.m. and ended at 12:15 p.m. After a lunch break of over two hours, the court reconvened at 2:30 p.m., and the defense began presenting its case. The defense called three witnesses before the defendant took the witness stand at approximately 4:30 p.m. Shortly after 7:00 p.m., the defendant's testimony ended. Following the brief examination of one more defense witness, the defense rested at 7:20 p.m. The court then held an instruction conference outside the presence of the jury until approximately 8:05 p.m., when closing arguments began. After the completion of the arguments, the judge instructed the jury, and the jury recessed for deliberations at approximately 9:30 p.m. At 11:20 p.m., the jury announced its verdict of guilty on all counts.

In appealing his convictions, the defendant argues first that the district court's scheduling of the trial deprived him of a fair trial. The defendant further contends

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, Eastern Division, is sitting by designation.

that the evidence was insufficient to support his convictions. Finally, the defendant maintains that errors in the trial court's instructions to the jury collectively operated to deprive him of a fair trial.

## SCHEDULING OF TRIAL

It is the defendant's position that the scheduling of his trial prejudiced his case both by compressing his defense and by coercing the jury verdict.

### Compression of Defense

■ According to the defendant, the trial court indicated to the jury that it wanted to conclude the trial by Friday, July 22, and "the pressure was on the defense" during both the government's case and the presentation of the defense to hurry the trial along to its Friday completion. Appellant's Brief at 10–11. The defendant points to several instances where the trial court told the defense counsel that he should "just keep going" and that he "should be able to finish [his] case without a break" on Friday. *Id.* at 11. The government responds by asserting that the trial court did not curtail the presentation of the defense in any way and that the court treated the prosecution and the defense equitably throughout the trial.

It is clear that a district court has wide discretion in the scheduling of a trial and that this discretion should not be disturbed in the absence of manifest abuse. *United States v. Van Dyke*, 605 F.2d 220, 227 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979); *Carter v. United States*, 373 F.2d 911, 914 (9th Cir.1967). *See United States v. Walker*, 559 F.2d 365, 371 (5th Cir.1977). Such abuse was found in *United States v. Diharce-Estrada*, 526 F.2d 637 (5th Cir.1977), where the trial

began at 7:30 p.m., after the jury had spent the entire day waiting to serve and only minutes after the defense counsel had finished another trial. The trial court required that closing arguments be delivered that evening, as punishment to the defense counsel, who had requested that he be allowed to present more evidence on the following day. The Fifth Circuit ruled that "the abbreviated nocturnal trial accorded Diharce simply will not pass muster as a fair way to resolve the close factual issues in his case." *Id.* at 650–51.[1]

In the present case, the defendant's trial took place over five days. There is no suggestion in the record that, during the prosecution's case, the trial court limited the defense counsel in cross-examining government witnesses.[2] Furthermore, this case differs from *Diharce-Estrada* in that the record does not indicate that the defense counsel needed more than the afternoon and evening of Friday, July 22, to present evidence. The defense counsel voiced his only objection to the time allotted for the presentation of his case during the cross-examination of the defendant. At about 7:00 p.m., the defense counsel asked for a sidebar conference during which he stated that, after two and one-half hours of testifying, "[the defendant] is not the same man that I put on the stand." Trial Tr. at 586. In response, the trial court promptly observed for the record that the defendant "seems to be coherently testifying just as he did when he took the stand." *Id.* Giving, as we must, due deference to the observations of the trial court, we are unable to conclude, from the record before us, that the scheduling of trial unfairly compressed the presentation of the defense.

---

**1.** Although the Fifth Circuit found the scheduling of trial in *Diharce-Estrada* to be error, the court held no view as to whether this error alone was sufficiently prejudicial to require reversal. *United States v. Diharce-Estrada*, 526 F.2d at 641. The court vacated the conviction on the basis of the entire record, which also revealed that the trial court erroneously denied the defendant's motion for acquittal in the presence of the jury and that the prosecutor made a

number of improper remarks during closing argument. *Id.* at 641–42.

**2.** Indeed, the record reflects that after defense counsel cross-examined Kramer for several hours on the afternoon of Thursday, July 21, the trial court allowed cross-examination to continue on the following morning. *See* Trial Tr. at 320–443.

### Coercion of Jury Verdict

■ The defendant's second argument regarding the scheduling of trial is that the trial court's effort to complete the trial on Friday, July 22, led to mistreatment of the jury. The defendant states that "the [Friday] afternoon session began at 2:30 p.m., and went through to the return of the verdicts at 11:20 p.m., without supper for the jury or anyone else." Appellant's Brief at 9. Observing that the jury worked all day on July 22 with only a lunch break, the defendant maintains that the jury was forced to reach its verdict without giving the case the consideration that a rested and well-fed jury would have given. The government, on the other hand, informs us that the jury received supper when it began its deliberations. Furthermore, according to the government, the jury received two breaks before lunch on the morning of July 22, and the court ordered two recesses during the presentation of the defendant's case. In addition, the government notes that the jury received another recess at the close of the defendant's case while the court conducted the jury instruction conference. Stating that "the final day of trial was liberally peppered with rest periods for the jury and the parties, [and that] the jury was fed and generally cared for," the government disagrees that the jury was coerced into rendering its verdict without due consideration. Appellee's Brief at 22.

In *United States v. Diharce-Estrada*, 526 F.2d at 640, the trial judge opened the trial at 7:30 p.m. by informing the jurors that it was essential to complete the case by the following evening so that the judge could catch a plane. The Fifth Circuit held that these remarks, coupled with the immoderate treatment that the trial court gave to the defense counsel for his alleged attempts to delay the trial, "put undue pressure on the jury to reach a verdict more swiftly than the ends of justice will allow." *Id.* In addition, reviewing courts have held that a jury can be coerced into reaching a verdict by an improper *Allen* charge, a supplementary instruction that a trial court may give when it appears that a jury is

deadlocked. *See, e.g., United States v. Chaney,* 559 F.2d 1094 (7th Cir.1977) (where jurors could have understood *Allen* charge as meaning that they must reach a verdict to avoid being locked up, without sleep, until 9:30 a.m. or later, verdict was vacated and case was remanded for new trial); *United States v. Flannery,* 451 F.2d 880, 883 (1st Cir.1971) (trial court erred in reminding jury, in *Allen* charge, that it was Friday afternoon, since the implicit suggestion was that it was more important to be quick than to be thoughtful).

In the present case, the trial court did not give an *Allen* charge to the jury at any time during the deliberations. Moreover, although the court informed the jury during the trial that a companion case was scheduled to begin on Monday, July 25, and that there would be an effort to conclude the defendant's trial by Friday, July 22, the court certainly did not suggest, as did the court in *Diharce-Estrada,* that it was imperative to meet this deadline.

Nevertheless, we recognize that, regardless of a trial court's statements, jurors who begin deliberations at 9:30 on a Friday night, after a full day of trial and after serving all week, may be eager to reach a verdict and go home. For this reason, we do not encourage such scheduling, and we urge trial courts to poll jurors regarding their willingness to begin deliberations under such circumstances. Yet, we decline to hold, without clear indications that the jury was exhausted, hungry, confused, or otherwise uncomfortable, that deliberations begun on a Friday night are incapable of producing a fair verdict. After reviewing the record in the present case, we note with disapproval that when the defense counsel, during the instructions conference, raised his concerns regarding the lateness of the hour and the exhaustion of the jurors, the trial court summarily refused to poll the jurors to determine their willingness to begin deliberations. However, the court did find the jury "alert and fresh." Trial Tr. at 601. Furthermore, the court informed the jury before closing arguments that arrangements were being made for supper,

and, apparently, supper was served as the jury began deliberating.[3] The jury did not ask for clarifications during its deliberations, nor was the case so difficult that a decision rendered within two hours should be suspect. In sum, although we believe that the better course for the trial court would have been to poll the jurors regarding their willingness to start deliberations, the record in this case does not support the defendant's contention that the circumstances surrounding the jury's deliberations were coercive. We thus conclude, under the facts of this case, that the trial court did not abuse its discretion by allowing deliberations to begin at 9:30 on a Friday night.

## SUFFICIENCY OF EVIDENCE

■■■ The defendant argues that the evidence produced by the government was insufficient to sustain the jury's verdict. In support of this argument, the defendant points to the fact that he kept precise records of all his transactions. Asserting that he conducted his steel sales "in a most ordinary way," Appellant's Brief at 20, the defendant contends that his openness in record-keeping is consistent only with legitimate business and should create reasonable doubt on the question of his intent.

When determining the sufficiency of the evidence to support a criminal conviction, a reviewing court must decide "whether, af-

ter viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also Jentges v. Milwaukee County Circuit Court*, 733 F.2d 1238, 1240 (7th Cir.1984); *United States v. Roman*, 728 F.2d 846, 857 (7th Cir.1984); *United States v. Moya*, 721 F.2d 606, 609 (7th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984).

In the present case, there is considerable evidence that the defendant's business records served to camouflage his illegal activities. During several conversations recorded by Kramer while cooperating with the FBI, Kramer expressed gratitude to the defendant for demonstrating how false paperwork can disguise a stolen shipment of steel. The defendant at one point reminded Kramer that paperwork is "your big ticket." Government Ex. No. 27, at 43. Viewing such evidence in the light most favorable to the prosecution, we hold that a rational trier of fact clearly could have found the necessary illegal intent on the part of the defendant. Furthermore, our review of the evidence as a whole convinces us that a rational jury also could have found the other elements of the crime beyond a reasonable doubt.[4]

---

3. The government has appended a voucher and two receipts that show that 21 Italian beef sandwiches and beverages were purchased for the jurors and delivered at 9:00 p.m. on July 22, 1983. Government Appendix 22. In addition, the trial transcript indicates that this food was given to the jurors upon their retirement to begin deliberations. When the trial court excused the two alternate jurors at 9:37 p.m., he invited them to take their dinner home with them, thus indicating that food was being given to the deliberating jurors. *See* Trial Tr. at 664–65.

4. The government introduced at trial a videotape and several recordings of conversations concerning a potential sale of stolen steel coils that the FBI had set up in November 1982. Kramer, who was cooperating with the FBI, told the defendant that a man named "Bromley," who was an undercover FBI agent, had stolen steel coils and wished to sell them. On Novem-

ber 9, Kramer, the defendant, and "Bromley" met in a warehouse in Valparaiso, Indiana, where the defendant examined the steel and indicated that he could sell it. A videotape was made of this meeting, and recordings were made of two subsequent conversations in which the defendant told Kramer that Magnus had located buyers for the steel. In later recorded conversations between Magnus and Kramer, Magnus acknowledged that he knew the steel was stolen. In arguing to this court that there is insufficient evidence to sustain his conviction, the defendant contends that the November recordings were inadmissible at trial because they did not prove any wrongdoing related to the steel coil sales of February and June 1982, and they did not constitute evidence of a continuing conspiracy.

At this point during trial when the recordings of the Magnus/Kramer conversations were offered into evidence, the trial court ruled that

### JURY INSTRUCTIONS

The defendant maintains that the trial court erred both by failing to include an accomplice instruction regarding the credibility of Kramer's testimony and by giving an instruction on perjury, a crime for which the defendant was not charged.

 This court recently held that the lack of an accomplice instruction is error only if the accomplice's testimony is not supported by a minimum amount of corroboration. *United States v. McCabe*, 720 F.2d 951, 956 (7th Cir.1983). *See also United States v. Lee*, 506 F.2d 111, 120–21 (D.C.Cir.1974), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). Our review of the record in the present case leads to the conclusion that Kramer's testimony was amply corroborated by recorded conversations, the testimony of other witnesses, and business records. The trial court thus did not err in failing to give an accomplice instruction relating to Kramer's testimony.

We also find no merit to the defendant's contention that the trial court erred by instructing the jury on the crime of perjury. In its Instruction No. 33, the court stated: "All federal criminal prosecutions are initiated by the office of the United States Attorney, including all prosecutions for perjury." This instruction merely informed the jury that the government has the discretion to prosecute any participants in the defendant's trial with offenses relating to the alleged crime or with offenses committed during the course of the trial. The jury thus was not to consider the behavior of other participants in its deliberations regarding the defendant. We do not find that this instruction explained the elements of the crime of perjury, nor did it direct the jury to decide whether the defendant committed perjury. *Cf.* 2 Federal Criminal Jury Instructions of the Seventh Circuit, ch. 79 (1983) (perjury instructions). We therefore conclude that the trial court did not instruct the jury on an offense that was not charged, and no error was committed.

Accordingly, we affirm the defendant's convictions.

sufficient nonhearsay evidence had established the existence of a stolen steel conspiracy. The court thus found Magnus's statements admissible as a co-conspirator's statements made during the course of and in furtherance of the conspiracy. *See United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir.1978). We find that this ruling was correct. Furthermore, we find that the defendant's November statements, which were nonhearsay admissions of wrongdoing, were admissible to prove the continuance of the conspiracy through November 1982.