UNITED STATES of America,
Plaintiff–Appellee,

v.

David HUGHES, also known as Jesse El-
lebee, Atilano Velasquez, and Martin
Leanos, Defendants–Appellants.

Nos. 91–1004, 91–1038 and 91–1233.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1992.

Decided July 16, 1992.

As Amended July 22, 1992.

Daniel C. Murray, Asst. U.S. Atty., Ramune R. Kelecius (argued), Office of U.S. Atty., Crim. Div., Chicago, Ill., for U.S., in No. 91–1223.

Adam Bourgeois, Chicago, Ill. (argued), for defendant-appellant Martin Leanos.

Ramune R. Kelecius (argued), Office of U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for U.S. in Nos. 91–1038 and 91–1004.

Joseph R. Lopez, Chicago, Ill. (argued), for defendant-appellant Atilano Velasquez.

Richard S. Kling, Chicago–Kent College of Law, Chicago, Ill. (argued), for defendant-appellant David Hughes.

Before CUMMINGS and CUDAHY, Circuit Judges, and DILLIN, District Judge.*

CUMMINGS, Circuit Judge.

This case stems from a lengthy undercover operation conducted by agents of the Federal Bureau of Investigation ("FBI") into a large heroin, cocaine, and marijuana distribution ring led by Victor Velasquez that operated from about June 1988 until the end of August 1989 out of the second floor apartment above the El Chubasco Bar, located at 831 North Ashland Avenue in Chicago. The investigation included: 1) electronic recording of in-person as well as telephone conversations at the El Chubasco building; 2) the installation of audio. and video recording equipment and a transmitter in a hotel room at the Quality Inn just west of downtown Chicago; and 3) the use of Jose Lopez, a confidential informant, who arranged numerous drug deals with Victor Velasquez. A warrant to search the El Chubasco was issued on August 29,

1989. Twenty-three defendants were subsequently charged in a 124–count indictment with a narcotics distribution conspiracy and other narcotics offenses. 21 U.S.C. §§ 841(a)(1), 843(b), 845(a), 846, 848, and 18 U.S.C. §§ 2, 924(c). On this appeal, three of the defendants raise challenges to their convictions or sentences. We affirm.

## DAVID HUGHES

David Hughes, a.k.a. Jesse Ellebee, was charged with 16 counts of controlled substance offenses. In Count Two he was charged with knowingly and intentionally conspiring 1) to possess with intent to distribute heroin, cocaine, and marijuana, and 2) to use telephones in furtherance of the conspiracy. 21 U.S.C. §§ 841(a)(1), 843(b), and 846 and 18 U.S.C. § 2. In Counts 96–100, 102–104, 107–108, 110, 112, and 118–120, he was charged with using a telephone in connection with conspiracy to possess and distribute controlled substances. 21 U.S.C. § 843(b). At trial, the government called four FBI agents to testify and presented the tapes of drug-related meetings and intercepted telephone conversations as well as evidence recovered during the raid of the El Chubasco building. The government's case was that Hughes served as Victor Velasquez's drug deal negotiator, order-taker and messenger, supplier of narcotics, drug courier, bookkeeper of drug ledgers, and broker and that, in addition, Hughes was a mixer and a fixer[1] as well as a dealer running his own drug distribution network from the El Chubasco.

The theory of the defense was that Hughes was not a drug dealer, but rather a heroin addict who did handyman work for Victor Velasquez in exchange for heroin, and that any involvement on his part in the alleged conspiracy was limited to an attempt to secure drugs for his own personal consumption. The defense called three witnesses who testified that Hughes was a heroin addict: Riley Jones, a drug abuse counselor who was called as an expert; Joyce Edmonds, Hughes' sister; and Bar-

---

* Honorable S. Hugh Dillin, District Judge of the Southern District of Indiana, is sitting by designation.

1. A mixer and a fixer is someone who dilutes or cuts drugs for distribution.

bara Nunnery, Hughes' girlfriend and the mother of his two children.

The jury returned a verdict of guilty on all counts. Hughes was sentenced to 262 months in prison on Count Two with concurring sentences of 48 months on the 15 remaining telephone counts. Hughes appeals his conviction, arguing that the jury was not selected in conformity with *Batson v. Kentucky* and that his due process rights were violated when the district court made two evidentiary rulings that precluded him from presenting his defense.

## A. Jury Selection

Hughes, who is black, argues that the government exercised its peremptory challenges to exclude two black prospective jurors in violation of the dictates of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, and asks us to remand this case for a new trial. *Batson* held that the Equal Protection Clause of the Fourteenth Amendment prohibits the state from exercising its peremptory challenges to exclude blacks from the petit jury. *Id.* at 85, 106 S.Ct. at 1716. This prohibition extends to the federal government through the Due Process Clause of the Fifth Amendment. *United States v. Williams,* 934 F.2d 847, 849 n. 1 (7th Cir.1991). It is the defendant who ultimately bears the burden of establishing a discriminatory animus on the part of the prosecution. *Hernandez v. New York,* — U.S. —, 111 S.Ct. 1859, 1873, 114 L.Ed.2d 395 (1991) (O'Connor, J., concurring).

The Supreme Court has set forth an evidentiary framework to aid the trial court in determining whether the use of peremptory challenges rises to a constitutional violation. "The defendant * * * makes a *prima facie* case of purposeful discrimination in the selection of the petit jury by presenting facts and relevant circumstances that raise an inference that the government used the peremptory challenges in order to exclude venire members because of their race." *United States v. Nichols,* 937 F.2d 1257, 1262 (7th Cir.1991), certiorari denied, — U.S. —, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992). Once the *pri-*

*ma facie* case is established, the burden shifts to the government to articulate a neutral explanation for the exclusion of the black venire members, *Batson,* 476 U.S. at 94, 106 S.Ct. at 1721, that is "clear and reasonably specific, presenting legitimate reasons that are related to the particular case." *Nichols,* 937 F.2d at 1262. However, the government's explanation "need not rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97–98, 106 S.Ct. at 1723. The trial judge must then determine whether the government's use of a peremptory challenge was motivated by improper factors. *Id.* at 98, 106 S.Ct. at 1723. Because the trial judge's findings often involve questions of credibility, our review is deferential, and we will only overturn a finding regarding discriminatory intent in the use of peremptory challenges if it is clearly erroneous. *United States v. Ferguson,* 935 F.2d 862, 864 (7th Cir.1991), certiorari denied, — U.S. —, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992).

In the instant case, the venire consisted of 30 persons, four of whom were black. Two of those blacks were empaneled, and two were struck by the government. Hughes objected to each of these strikes. The trial judge overruled all of Hughes' objections, finding no racial factor in the explanations put forth by the government. At the end of the jury selection, the government had one peremptory challenge left.

The government argues that its peremptory strikes against the two black venire members were not racially motivated and that its explanations were race-neutral. The government challenged Lily Hill primarily because she had a cousin who had served two years in jail for a drug offense and robbery and who, since his release, was arrested and awaiting trial on other drug and robbery charges. Despite Hill's attestation to the contrary, the government questioned her ability to be fair and impartial, particularly in light of the proximity both in blood relationship and in time to her cousin's legal troubles, relying on its "intuitive assumptions" regarding the latent in-

clinations of a prospective juror. *United States v. Briscoe*, 896 F.2d 1476, 1489 (7th Cir.), certiorari denied, — U.S. —, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990) (approving intuitive assumptions that are not quantifiable). As a secondary reason, the government stated that it was looking for law-abiding and stable people, and that Hill was unemployed[2] and living with her fourteen-year old twins that she had had out of wedlock when she was forty.

The government challenged Tracy Allen because she is young, recently unemployed without having looked for another job, and lacks a stable, traditional household, as she is unmarried with three children. The government argues that it has an interest in having jurors with stable family backgrounds who would be fair to the government and who would not identify with the disorganized and uncertain lifestyles of drug dealers.[3] As a secondary reason, the prosecutor stated that Allen had taken a paralegal course a few years earlier which included "a taste of criminal law" and that he was a "little leery of people who have a little knowledge of the law." The government reasons that there is a danger that a person who has had some legal training herself or himself, as opposed to someone who has merely sat as a civil juror or had lawyers or law students for spouses, may bring a few extraneous and undeveloped legal principles to the deliberation process. *Williams*, 934 F.2d at 850.

Hughes argues that the government's explanations are a sham and not related to this case. Regarding Hill, Hughes argues that it is preposterous that an out-of-wedlock pregnancy 15 years earlier could demonstrate that a venire member does not possess stability and law-abiding characteristics. Moreover, none of the white venire members, married or not, were asked if they ever had children out of wedlock. As for her cousin's drug conviction, Hill unhesitatingly stated that she had no difficulty with a law that prohibits the possession or distribution of narcotics and that there was no reason why she could not be fair and impartial. Hughes points out that a white juror was kept even though he himself had had a conviction when he was a teenager. Regarding Allen, Hughes notes that the government did not strike two white jurors who were unemployed, nor did it strike white jurors who had prior jury service or who had a spouse that was either a lawyer or a recent law student.

We find that the government gave race-neutral explanations for each of its strikes against the black venire members. The trial judge, who was in a position to consider all of the relevant circumstances, ruled that the government's reasons were acceptable. The government's primary reason for excluding Hill was that she had a cousin with a drug conviction who was also awaiting trial on another drug arrest. We cannot say that it was clearly erroneous for the district court to conclude that this race-neutral explanation was credible.[4] Allen was excluded primarily for being young, unemployed, and from an unstable or untraditional background because she was never married, yet had three children. *Nichols*, 937 F.2d at 1264 (age and marital status are legitimate reasons for the exercise of peremptory challenges); *Ferguson*, 935 F.2d at 865 (youth and unemployment justified strikes). While it is true that some unemployed white venire members were empaneled, none of the white venire members had all of these factors in combination. Thus we cannot say that the district court's finding that the government's

---

2. The government admits that it erred when it characterized Hill as unemployed, but that such an error was not relevant since the primary reason for excluding Hill was her relationship with her cousin.

3. We note that this argument made in the government's appellate brief was not presented to the district court. As has been stated before, "a nexus [between the challenge and the ruling thereon] should ordinarily be a significant part of the [district court's] rationale." *Ferguson*, 935 F.2d at 868 (Cudahy, J., concurring).

4. Although Hughes' point is well-taken that the government did not question any of the married or single white jurors whether they ever had children out of wedlock, instead concluding that an older black woman who had twins out of wedlock 14 years earlier was unstable, we need not consider it, since the government's primary reason for excluding Hill was acceptable.

reason was acceptable under *Batson* was clearly erroneous. There are additional facts that weaken the argument that the government's strikes were based on a motive to discriminate: two blacks of four on the venire were empaneled, the government did not use all of its peremptory challenges to exclude blacks, and the government had one peremptory challenge left. See *Nichols*, 937 F.2d at 1264 (citing cases). Accordingly, we hold that the government's explanations comport with the mandate of *Batson v. Kentucky.*

## B. *Evidentiary Rulings*

Hughes next argues that the trial court committed reversible error in violation of the Due Process Clause of the Fifth Amendment when it precluded him from presenting his defense. Hughes points to two of the trial court's evidentiary rulings, which, he alleges, prejudiced him. The first is the trial court's refusal to allow Hughes to enter into evidence a notebook, which allegedly contained exculpatory evidence, recovered by the FBI from the El Chubasco. The second is the trial court's refusal to allow a defense witness to testify to certain statements that Hughes allegedly made indicating his intent to secure drugs for his personal use. Hughes argues that these evidentiary rulings had a substantial effect on his rights and resulted in actual prejudice in its influence on the jury's verdict, *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986), in that the "excluded evidence would have been the only or primary evidence in support of * * * [his] defense." *United States v. Peak*, 856 F.2d 825, 834 (7th Cir.), certiorari denied, 488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988).

We give special deference to the evidentiary rulings of the trial court, which is in the best position to balance probity and prejudice. *United States v. Degaglia*, 913 F.2d 372, 375 (7th Cir.1990). Therefore, we will only reverse a decision regarding the admissibility of evidence if the trial court has clearly abused its discretion. *United States v. Williams*, 951 F.2d 853, 857 (7th Cir.1992). An abuse of discretion

generally occurs only " 'where no reasonable person could take the view adopted by the trial court.' " *United States v. Tipton*, 964 F.2d 650, 654 (7th Cir.1992) (quoting *United States v. Manos*, 848 F.2d 1427, 1429 (7th Cir.1988)). An erroneous evidentiary ruling is reversible error if it results in actual prejudice because of its "substantial and injurious effect" on the determination of the jury's verdict. *Lane*, 474 U.S. at 449, 106 S.Ct. at 732.

### 1. Notebook

During the search of Victor Velasquez's apartment above the El Chubasco Bar, the FBI recovered a spiral notebook. At trial, the government introduced one page from this notebook, which contained notations of two telephone messages, one from Hughes for Victor Velasquez, the other for Hughes. The government introduced the page in order to prove an association between Hughes and both Victor Velasquez and the El Chubasco Bar.

In its case in chief, the government made reference to Hughes as being responsible for keeping drug ledgers. To rebut the government's contention that he kept the records by showing that someone else kept them, twice Hughes attempted to introduce the rest of the notebook. Hughes contended that the notebook was relevant to his defense and was thus admissible under Federal Rule of Evidence 401.

The government objected to the admissibility of the notebook on the ground of relevance, since one of its FBI witnesses unequivocally testified that the notations in the notebook were not related to narcotics activities. On appeal, the government argues that Hughes failed to lay a foundation for the relevancy of the notebook and that the notebook was not relevant to any legitimate defense because it was not a ledger. In fact, no ledgers were found in the search of the El Chubasco building. The evidence that the government did introduce regarding drug ledgers was a telephone conversation between Hughes and another codefendant in which Hughes himself stated that he had maintained drug ledgers for Victor Velasquez in the past. Moreover, in

his closing argument, Hughes' counsel argued to the jury that the government produced no evidence that Hughes handled the books for Victor Velasquez or that Hughes' fingerprints were even on the notebook in question.

The trial judge excluded the notebook on the ground that its probative value would be substantially outweighed by its potential to prejudice Hughes by confusing the issues and misleading the jury. Fed.R.Evid. 403. Since there were no other references in the notebook to Hughes, the trial judge was concerned that the jurors would spend an inordinate amount of time theorizing about the entries in the notebook and, without guidance in considering the notebook, be left to "conjure up all kinds of things one way or another and try to interpret these [notations] as codes or whatever." Trial Transcript at 901.

■ Under Federal Rule of Evidence 403, a trial judge may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." We accord great deference to assessment of relative probative value of the trial judge, who has first-hand exposure to the evidence and is familiar with the course of the trial, and will only reverse the trial judge's decision for an abuse of discretion. *United States v. Morris*, 957 F.2d 1391, 1399 (7th Cir.1992).

■ We agree that the probative value of the notebook was substantially outweighed by its prejudicial effect. Because the jury knew that the notebook was not a ledger and did not contain drug-related entries, its introduction would not substantially aid the defense. Evidence of Hughes' participation in the conspiracy was before the jury on the tapes, and, whether or not the notebook had handwritten entries made by someone else, Hughes could have kept drug records for Victor Velasquez sometime in the past. On the other hand, the jury might have been confused and misled by the admission of the notebook. Given our deferential standard of review, we cannot say that the trial judge abused his discretion in refusing to admit the notebook.

### 2. Witness Testimony

While defense witness Barbara Nunnery was on the stand, Hughes attempted to elicit testimony from her that she had numerous conversations with Hughes in which he told her that he intended to go to the El Chubasco to purchase drugs. Nunnery was permitted to testify regarding Hughes' intent to go to the El Chubasco, but the trial judge sustained the government's objection as to the reason why he went there on hearsay grounds. Hughes argues that such statements of intent are admissible under Federal Rule of Evidence 803(3) and *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), and that the distinction between "where" and "why" was erroneous, depriving him of his right to put on his defense. He argues that the testimony he attempted to elicit from Nunnery was relevant to his defense that he worked for Victor Velasquez to get narcotics for himself, not to distribute them. Nunnery's testimony would allegedly explain his presence at the El Chubasco and show that he was employed by Victor Velasquez as a bouncer and a janitor and was paid for his services in drugs. Hughes argues that because this evidence was the sole means of presenting his theory of defense to negate the intent to distribute, the trial court's ruling was reversible error. See *Peak*, 856 F.2d at 834.

■ Federal Rule of Evidence 803(3) provides an exception to the hearsay rule for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." To be admissible, the statement must have been made under such circumstances, so that the declarant had no time to either reflect or to misrepresent his thoughts. *United States v. Harvey*, 959 F.2d 1371, 1375 (7th Cir.1992). "Statements indicating state of mind are generally admissible only when state of mind is in issue or when it tends to prove

the doing of the act intended." *Peak,* 856 F.2d at 833 (citing *Hillmon,* 145 U.S. 285, 12 S.Ct. 909).

■ We agree with Hughes that the statement of his intent to go to the El Chubasco to procure drugs was admissible under Federal Rule of Evidence 803(3) because it was offered to show Hughes' then existing state of mind and because it was relevant to the theory of the defense. We must, therefore, determine whether the trial court's error in excluding the evidence was harmless beyond a reasonable doubt. Fed.R.Crim.P. 52(a). "Unless the error creates a significant risk of convicting an innocent person, it should be disregarded." *United States v. Green,* 786 F.2d 247, 252 (7th Cir.1986).

Despite the trial court's evidentiary error, Hughes was able to present his side of the case to the jury. See *United States v. Norwood,* 798 F.2d 1094, 1098 (7th Cir.), certiorari denied, 479 U.S. 1011, 107 S.Ct. 656, 93 L.Ed.2d 711 (1986) (evidentiary error did not injuriously influence jury's verdict); *United States v. Cerro,* 775 F.2d 908, 916 (7th Cir.1985) (reversal is required even if evidence of guilt was overwhelming if the defendant was utterly precluded from defending himself because of the exclusion of evidence). Hughes presented ample evidence that he was a drug addict, which the government did not dispute. Nor was evidence that Hughes was going to the El Chubasco to obtain drugs for himself inconsistent with the government's theory that Hughes was both a drug addict and a drug dealer who purchased drugs for both his personal consumption and for resale. Cf. *Peak,* 856 F.2d at 835 (reversible error found where exclusion of evidence tending to disprove intent required for conviction was vital to defendant). In any event, in light of all of the evidence of guilt the government presented in numerous tapes which implicated Hughes in the conspiracy and in the distribution of drugs, any such impediment to Hughes' defense was minor

and must be deemed harmless beyond a reasonable doubt. *Cerro,* 775 F.2d at 916.

### MARTIN LEANOS AND ATILANO VELASQUEZ

On August 30, 1989, Martin Leanos and Atilano Velasquez ("Atilano"), the cousin of Victor Velasquez ("Victor"), pleaded not guilty to all pertinent counts of the indictment.[5] The next day, each withdrew his not guilty plea and entered a plea of guilty to Count Two pursuant to a plea agreement that stipulated that the criminal history category under the United States Sentencing Guidelines ("Sentencing Guidelines") for each of them would be "I" and that the government would dismiss the remaining counts.

The parties agreed that prior to and including May 4–5, 1989, Victor was negotiating by telephone to purchase cocaine from Leanos, which Atilano was to pick up, but that Leanos never produced the cocaine. In Atilano's plea agreement, he and the government agreed that 1) he had participated in the negotiation for the sale of approximately one kilogram of cocaine; 2) his adjusted offense level under the Sentencing Guidelines was 26; 3) he merited a two-level downward adjustment for acceptance of responsibility; and 4) the minimum sentence for the narcotics conspiracy in Count Two was five years and the maximum sentence was 40 years, supervised release for a term of four years up to and including life, and a maximum fine of $2 million. In Leanos' plea agreement, on the other hand, the parties reserved the right to argue certain disagreements at the sentencing hearing, namely, 1) the amount of cocaine involved, which would affect the offense level under the Sentencing Guidelines as well as the mandatory minimum sentence; and 2) whether Leanos merited a reduction for acceptance of responsibility.

■ At the sentencing hearing on December 20, 1990, the sentencing judge heard testimony from the government's

---

**5.** Count Two charged both of them with participation in the drug conspiracy from about June 1988 until the end of August 1989. 21 U.S.C. § 846 and 18 U.S.C. § 2. Leanos was charged with using the telephone in connection with the conspiracy in Counts 85–88, and Atilano was charged with the same in Counts 42–43, 62, 84, 89–91, and 93–94. 21 U.S.C. § 843(b).

witness, FBI Agent Donald Kopec, and from the defendants' witnesses, Victor and Leanos. The sentencing judge then made a finding of fact that one kilogram of cocaine was involved. Both defendants were sentenced on Count Two to the mandatory minimum sentence of five years with four years of supervised release. Pursuant to the plea agreements, the government dismissed the remaining counts. Both defendants appeal their sentences, arguing that FBI Agent Kopec was not properly qualified as an expert witness in coded drug conversations and that the district court's finding that one kilogram of cocaine was involved was not supported by the evidence.[6]

### A. Expert Testimony

■ At the sentencing hearing, the government called FBI Agent Donald Kopec to testify as an expert on coded conversations. Over the defendants' objection, the sentencing judge found Kopec to have sufficient expertise to testify concerning the coded conversations relevant to this case. We review a district court's qualification of an expert for an abuse of discretion. *United States v. Briscoe*, 896 F.2d 1476, 1497 (7th Cir.), certiorari denied, —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). Atilano and Leanos argue that the sentencing judge abused his discretion in allowing Kopec to testify as an expert for several reasons: 1) he had only a little formal education in drug transactions; 2) he had no specialized knowledge to interpret words he had never heard in the context of a drug transaction before; 3) his testimony was not corroborated by any other evidence; and 4) the court essentially delegated the fact finding to Kopec regarding the interpretation of the transcripts of the recorded conversations.

■ The government responds that Kopec, in fact, did have sufficient training in the area of narcotics investigations, includ-

---

6. Attorney Bourgeois received leave of this Court to substitute himself as appellate counsel for Leanos after the initial brief was filed and before the reply brief was filed. In his reply brief, counsel addressed the following issues: 1) that the district court erred by not addressing whether Leanos had the ability to supply one kilogram of cocaine; 2) that Kopec's analysis of the tape recordings in evidence did not support the sentencing judge's finding regarding the negotiated quantity of cocaine because Kopec's analysis was based on speculation; 3) that Leanos pleaded guilty to an offense that he did not commit as a matter of law because there was insufficient evidence at the plea hearing concerning his membership in the charged drug conspiracy; and 4) that Leanos received ineffective assistance of counsel because trial/appellate counsel did not challenge the sufficiency of the factual basis underlying the plea. The government argues that these issues were not addressed in the initial brief and has moved to strike the reply brief on the ground that raising new matters therein violates Circuit Rule 28(f), which provides that "[a] reply brief shall be limited to matter in reply." Leanos' counsel responds that the government's motion was untimely, as it was prepared less than 24 hours before oral argument, and that, in any event, the government would suffer no prejudice if it were allowed to submit a modified responsive brief, even after oral argument. He disagrees with the government's characterization of all of the issues addressed in his reply brief, since Leanos' ability to supply cocaine was addressed in the opening brief under the three *Ruiz* factors

and, although the word "speculative" was not used, the opening brief did attack Kopec's testimony. Although counsel admits that there are new issues raised in his reply brief, namely, Leanos' pleading guilty to a crime which he did not commit and ineffective assistance of counsel, he asks us to consider these new issues in the interests of justice and not to strike the reply brief.

We agree with Leanos that two of the issues addressed in the reply brief were sufficiently raised in the opening. However, we will not consider the new issues since "'[a]rguments raised for the first time in a reply brief are waived.'" *Damato v. Sullivan*, 945 F.2d 982, 988 n. 5 (7th Cir.1991) (quoting *Ippolito v. WNS, Inc.*, 864 F.2d 440, 455 n. 12 (7th Cir.1988)). Nor were they raised at the sentencing hearing. *United States v. Blythe*, 944 F.2d 356, 359 (7th Cir.1991) (failure to raise a challenge in front of the sentencing court waives that issue on appeal). Moreover, we note that the transcripts from the plea hearing have not been made part of the record on appeal and that "'ineffective assistance of counsel claims are best dealt with at the district court level, either through a motion for a new trial, * * * or through the collateral relief available under 28 U.S.C. § 2255.'" *United States v. Limehouse,* 950 F.2d 501, 503 (7th Cir.1991), certiorari denied, —— U.S. ——, 112 S.Ct. 1962, 118 L.Ed.2d 563 (quoting *United States v. Reiswitz,* 941 F.2d 488, 495 (7th Cir. 1991)). Accordingly, the government's motion to strike the reply brief of Martin Leanos is granted in part and denied in part.

ing course work through the FBI and the Drug Enforcement Administration and experience in several narcotics investigations involving electronic surveillance. Kopec testified that, although he was mostly familiar with English code words, he had some knowledge of Spanish code words as well.[7] Finally, the government argues that although Kopec's testimony "embraced the ultimate issue at the hearing," it was the sentencing judge, who, having access to all of the tapes and transcripts, was able to assess the validity and credibility of Kopec's interpretations.

This Court has recognized that narcotics code words constitute an appropriate subject for expert testimony, *United States v. Foster*, 939 F.2d 445, 451 (7th Cir.1991), and that federal agents who have training and experience "in drug-related transactions, crimes and prosecution are qualified to give expert testimony concerning the practices of those engaged in this type of activity." *United States v. Gonzalez*, 933 F.2d 417, 428 (7th Cir.1991). We agree with the sentencing judge that Kopec was qualified to give an expert opinion regarding the ultimate issue to be determined at sentencing, that is to say, the narcotics code words, quantities, and prices. Fed. R.Evid. 704(a) ("testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact"). The district court did not abuse its discretion in qualifying Kopec as an expert or in admitting his testimony.

**B.  Quantity of Drugs**

Atilano and Leanos also argue on appeal that the government did not prove by a preponderance of the evidence that one kilogram of cocaine was involved in the conspiracy and maintain that the transaction was to be for two ounces.[8] They argue, specifically, that the government failed to prove the following: 1) that the amount under negotiation in the uncompleted transaction was one kilogram; 2) that Leanos and Atilano intended to produce a kilogram; and 3) that Leanos and Atilano were "reasonably capable of producing" one kilogram. *United States v. Ruiz*, 932 F.2d 1174, 1184 (7th Cir.), certiorari denied, —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991). They further argue that, in fact, their capability to deliver drugs was simply not addressed by the government's proof despite the fact that there was no evidence that they had ever done any drug business before.

The government responds that it had proved the *Ruiz* factors by a preponderance of the evidence. *Id.* at 1184.[9] In considering Kopec's interpretation of the meaning of 17 drug-related conversations involving several members of the conspiracy, the sentencing judge concluded that one kilogram of cocaine was involved in the proposed deal. Since no transaction ever in fact occurred, the meaning of the tapes regarding the negotiations on May 4 and 5,

---

7.  Many of the intercepted conversations were in the Spanish language. Kopec and the court relied on English translations, to which the defendants raised no objection.

8.  Although Atilano agreed in his plea agreement that he had participated in the negotiation for the sale of one kilogram of cocaine, at the plea hearing he disputed the quantity of cocaine involved. The government agreed that this issue would be determined by the sentencing court. Sentencing Transcript at 9.

9.  The *Ruiz* factors are based on application note 1 of U.S.S.G. § 2D1.4, which reads in relevant part: "where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was

not reasonably capable of producing." The government has argued that the *Ruiz* factors do not apply to this case because Atilano and Leanos received the statutory minimum sentence rather than a sentence under the Sentencing Guidelines. We disagree with the government's contention that this is not a Sentencing Guidelines case. Had the sentencing judge agreed with the defendants that only two ounces of cocaine were involved in the negotiation, he would have sentenced them under the Sentencing Guidelines. However, once the sentencing judge determined that the amount of cocaine involved was more than 500 grams, the Sentencing Guidelines themselves required the sentencing judge to render a sentence no lower than the minimum that 21 U.S.C. § 841(b)(1)(B)(ii) required. U.S.S.G. § 5G1.1(c)(2).

1989, was that the defendants intended to distribute one kilogram of cocaine, and though Leanos may have been having some difficulty in producing the cocaine, the trust conferred on him by Victor indicates that Leanos was reasonably capable of producing one kilogram of cocaine.

 The sentencing judge determines the amount of drugs involved by a preponderance of the evidence. *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991). We accept a sentencing court's determination of the quantity of drugs involved in an offense absent clear error. *United States v. Cea*, 963 F.2d 1027, 1030 (7th Cir.1992). "[T]he sentencing court should consider negotiated amounts of drugs absent a determination that the defendant did not intend to or could not produce those amounts." *United States v. Buggs*, 904 F.2d 1070, 1079 (7th Cir.1990).

 Several conversations between May 4 and 7, 1989, implicated the defendants in the negotiation for the sale of one kilogram of cocaine, with Victor as the buyer, Atilano as his middleman and assistant, and Leanos as the supplier. In order to determine the subject of the taped conversations, the government's expert, Kopec, considered five factors: 1) the length of the conversation; 2) the tone of the voice; 3) the presence and absence of code words; 4) whether the code words would make any sense if taken literally; and 5) the context of the particular conversation with relation to other conversations which may have occurred within a short period of time. Although the deal fell through, Kopec was able to interpret that from his own knowledge of the market price of drugs and from the context of numerous taped conversations, the amount of cocaine that Victor, Atilano, and Leanos negotiated was one kilogram.[10]

The sentencing judge found Kopec's testimony credible. He found that individuals involved in narcotics transactions tend to speak in coded terms, and that those terms could have different connotations in differ-

ent circumstances. The judge found that, here, terms like "a gallon of paint" and "truck," "van," and "tractor" when used by the co-conspirators in several conversations, including the proposed transaction on May 4th, indicated the involvement of a kilogram quantity of cocaine. The sentencing judge further noted that the defendants did not contest the fact that they were discussing the sale of cocaine in the taped conversations. Rather, they maintained that certain code words used in those conversations, such as "truck" and "van," referred to the actual objects and were not code words for drugs. Leanos and Victor testified that the negotiated transaction that involved Atilano and them was for only two ounces of cocaine. The sentencing judge, after reviewing all of the conversations in context, concluded, over the objection of the defendants, that the government had established by a preponderance of the evidence that the proposed transaction was to involve one kilogram of cocaine.

 The defendants further argue that the sentencing judge made no findings as to whether they intended to produce one kilogram or were reasonably capable of producing one kilogram. We disagree. Although no transaction in fact occurred, the specific negotiations over the telephone regarding price and quantity indicated that they intended to produce that amount. See *Cea*, 963 F.2d at 1031. Regarding the capability of Leanos to supply that amount, at sentencing Leanos' counsel argued that Leanos neither knew where to get that amount nor could get it. Sentencing Transcript at 164. The government's position was that because Victor and Leanos were still friendly after the transaction did not materialize, the court could infer that other transactions had been completed in the past and that there was a likelihood that others would be in the future. *Id.* at 163. Thus the sentencing judge had the arguments regarding the capability to produce one kilogram before him and made the specific

---

**10.** Kopec testified that he had independent knowledge of the market value of various drugs, and from the knowledge that a kilogram of cocaine cost between $16,000 and $18,000 in Chicago in 1989, he was able to interpret the amount of cocaine negotiated.

finding that the more likely reason that the transaction for one kilogram of cocaine never occurred was not through any particular fault of the defendants but rather because they were aware that some government surveillance was going on. *Id.* at 166. In any event, the facts of this case are distinguishable from *Ruiz*, in which this Court refused to accept a single offhand comment, which we referred to as braggadocio, as evidence of capability of producing a certain quantity of drugs. *Ruiz*, 932 F.2d at 1184. Here not only were there recurrent conversations in which Leanos spoke as if he were capable of producing the negotiated amount, but there was also evidence that the relationship between Victor and Leanos was friendly and suggested a mutual trust from which it could be inferred that Victor certainly had reason to believe that Leanos could supply the negotiated amount. Our review of the record indicates that the sentencing judge's conclusion was not clearly erroneous.

## CONCLUSION

For the foregoing reasons, the conviction of David Hughes and the sentences of Martin Leanos and Atilano Velasquez are

AFFIRMED.