Ranjit ROY, Plaintiff–Appellant,

v.

THE AUSTIN COMPANY and J. William Melsop, Defendants–Appellees.

No. 98–3485.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1999.

Decided Oct. 20, 1999.

John L. Miller (argued), Woerthwein & Miller, Chicago, IL, for Plaintiff-Appellant.

Kathryn M. Moran (argued), Lord, Bissell & Brook, Chicago, IL, for Defendants-Appellees.

Before EASTERBROOK, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

It's always difficult to prove discriminatory discharge claims under Title VII, but the task gets even harder when the jury learns that the plaintiff called the lead player for his firm's most important client a "fucking bastard" during a critical meeting. Or at least that's what Ranjit Roy discovered when a jury concluded that his behavior—not his brown skin or Bengali origin—caused The Austin Company to cut him loose. Roy now appeals the verdict, arguing that three errant evidentiary rulings hobbled his claim.

Title VII cases, more often than not, come to us after a district judge has granted summary judgment for the defendant. *See Hunt–Golliday v. Metropolitan Water*, 104 F.3d 1004 (7th Cir.1997) (noting that 26 Title VII cases in 1996 reached us in this posture). Naturally, when we consider such cases, we set out the facts in the light most favorable to the plaintiff. We won't do that here. Because the case was rejected by the jury (after a trial that lasted a little over a week), we must present the facts in the light most favorable to the verdict. With that in mind, here are the facts.

The Austin Company is a nationwide engineering firm with offices in nine cities. In 1973 Austin hired Ranjit Roy to work as a structural engineer at its Atlanta branch. It was a good job, and from the start Austin let Roy know that if he performed well he would rise within the company and be assured of continued employment. For 20 years this is exactly what happened. Austin named Roy its chief structural engineer for the Atlanta office within a year of his hiring, and in 1978 he accepted a transfer to Chicago. Eleven years later he became manager of engineering for that office. In this position he attended client meetings.

In late October 1993 Roy participated in such a meeting with representatives of MCI Communications. At the time, Austin handled over 75 percent of MCI's engineering needs, and the MCI account constituted a large part of Austin's work— without MCI's 1993 business Austin would have had to lay off some 10 engineers and associated staff. This was no secret, and everyone at Austin knew that their fortunes depended on good dealings with MCI. Thus, any Austin employee would have been upset to learn that MCI had called the October meeting to discuss the cancellation of a major project it had hired Austin to build.

Roy took the news particularly hard. He showed up late for the meeting, snubbed two MCI employees and, despite being told not to say anything, started muttering under his breath. When Ray White, the head of the MCI contingent, inquired about the status of the project, Roy blurted out, "I don't know why we do this fucking shit." A prolonged silence ensued. When things got rolling again, Roy kept himself under control until White asked a question of Jeff Raday, Austin's assistant district manager. Raday didn't know the answer so White readdressed his query to Brad Shafer, the manager of the MCI account. At this point, Roy leaned across the table, pointed at White, and told him that "by not directing the question to the management of The Austin Company, who is presently Jeff Raday, you are insulting The Austin Company." Raday decided it was time to get Roy out of the meeting. He led Roy to an adjoining conference room which, unfortunately for Roy, had no door. As the two talked, White walked by on his way to the bathroom. Seeing White, Roy saw red. He pointed at White and said, "That fucking bastard." White heard it, and when Raday returned to the meeting (without Roy), White told him that he didn't appreciate being referred to in that manner and that he wanted an apology.

Raday thought White would get an apology since he told Roy to make amends. But Roy would not relent. Thus, when

Shafer called White a few days later, White reported that the senior managers at MCI were upset that there had been no apology. Shafer realized this could mean big trouble for Austin so he immediately relayed White's comment to J. William Melsop, Austin's president. Melsop then called White and tried to patch things up. But when White reported his version of the events, concluding that had the incident not occurred Austin would have been the logical choice to take on a new incarnation of the canceled project, Melsop realized he needed to take more dramatic action to smooth relations between the two companies. With that, he fired Roy.

Following his dismissal Roy filed suit for everything from defamation to promissory estoppel. His only complaints to survive summary judgment were for race, color, and national origin discrimination against Austin under Title VII (Roy alleges that he is an "Asian of Indian National origin, Bengali descent, and brown complexion"), and a state law claim for intentional interference with contractual relations against Melsop. These claims proceeded through trial and, as we said, the jury sided against Roy.

The first issue for review is whether the district court (Judge Ann C. Williams) erred in granting a motion *in limine* precluding Roy from introducing evidence that four white Austin employees were transferred rather than fired after disagreements with clients. The judge reasoned that since these employees were not disciplined by Melsop, and since they did not hold the same position as Roy, Austin's treatment of them was "irrelevant and likely to confuse the jury".

■ Roy contends that Judge Williams applied the wrong law to reach this conclusion. He believes that since she cited *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343 (7th Cir.1997), to support her exclusion of the evidence, she made her relevance determination according to *Plair* rather than the standards set forth in Federal Rules of Evidence 401 and 402. Because,

says Roy, this was a legal error, we must assess the judge's ruling *de novo*.

This request anticipates (correctly) the rough treatment Roy's contention faces if the ruling is reviewed for an abuse of discretion. Unfortunately for Roy, his effort to escape the standard fails. Relevance is not measured in a vacuum. It is assessed in light of the underlying substantive law. Here, the trial court cited *Plair* for the proposition that showing disparate treatment by a different supervisor does not normally further a plaintiff's ability to make out a discrimination claim under Title VII. The judge merely used this rule as a guidepost in deciding what showings would be relevant to Roy's claim. Because this is exactly how the Federal Rules of Evidence are supposed to work, Roy presents no reason to doubt that the court applied the correct standard. Therefore, we review the ruling only for abuse of discretion. *United States v. Hughes*, 970 F.2d 227, 232 (7th Cir.1992).

■ As Roy feared, this kills his claim. We have held that for a trial court to abuse its discretion it must make a decision that no reasonable person could agree with—a ruling that is "fundamentally wrong." *Williams v. Chicago Bd. of Educ.*, 155 F.3d 853, 857 (7th Cir.1998); *see also Holmes v. Elgin, Joliet & Eastern Ry. Co.*, 18 F.3d 1393, 1397 (7th Cir.1994). Judge Williams' determination that other employees were not sufficiently similar to Roy to make their treatment relevant to Roy's claim is not fundamentally wrong. It is a reasonable assessment of Roy's evidence in light of the applicable law—a call that falls well within her broad discretion as the trial judge on the front line.

■ Roy next objects to the exclusion of evidence that would have established that all of the executives at Austin's corporate headquarters in Cleveland were white. At trial, Roy argued that this showed Austin released him because he was more expendable than white employees who might join the company's executive ranks. Judge

Williams disagreed, finding that because Roy was neither an executive nor part of the Cleveland office the racial makeup of executives in Cleveland was irrelevant to the question of whether he was treated differently than other similarly situated employees.

Once again, Roy claims that this decision was governed by *Plair* rather than the rules of evidence. Here, what proved specious before becomes downright ridiculous: In a sidebar that preceded Judge Williams' decision to exclude evidence about the racial composition of the Cleveland office, neither the judge nor any of the parties even mentioned *Plair*. Because Roy presents no evidence that Judge Williams misapplied the law, we again review her decision only for an abuse of discretion. Again, we find her ruling well within the bounds of reason.

The final issue concerns the district court's decision to permit Austin to play for the jury certain sections of White's videotaped deposition. During discovery, both sides agreed to preserve White's testimony because he was not going to personally appear at the trial. Roy's lawyers began the questioning, conducting a direct examination of White to elicit his recollection of the events surrounding the meeting and his subsequent phone conversation with Melsop. When discussing the conversation, however, White did not mention telling Melsop that Roy called him a "fucking bastard." Later, Austin's counsel asked a series of questions about the conversation to make sure the deposition reflected that White told Melsop about the incident. At trial, Roy sought to have the answers to these questions excluded because Austin's counsel "inappropriately led her witness." The judge found that while there might have been merit to Roy's objection during the deposition, his failure to make an objection at the time precluded Roy from keeping White's answers from the jury.

■ To contest this ruling, Roy cites *Oberlin v. The Marlin American Corp.,*

596 F.2d 1322 (7th Cir.1979). This seems strange since *Oberlin* stands for the proposition that if a party does not voice an objection to the form of a question during a deposition, the party waives its ability to raise the objection at trial. *Oberlin,* 596 F.2d at 1328. Then, as now, the rule makes sense—if a party could strategically withhold an objection during a deposition and later exclude testimony that could have been elicited if the objection were raised promptly, depositions as trial evidence would quickly lose their value. *Id.;* see also *Kirschner v. Broadhead,* 671 F.2d 1034, 1037–38 (7th Cir.1982). Nevertheless, Roy pins his hopes on a section of *Oberlin* where we blessed the trial court's decision to bar portions of a deposition despite the opposing counsel's failure to object to an inappropriate question. *Oberlin,* 596 F.2d at 1329. His faith is misplaced. The exception to *Oberlin's* principal holding was rooted in the trial court's exercise of its discretionary control over the mode of interrogating witnesses and presenting evidence to ensure that a trial serves its fundamental truth-seeking purpose. *Id.* Because Roy's failure to object comes squarely under the primary meaning of *Oberlin*—if Roy had objected, the information could easily have been drawn out via nonleading questioning—and because it is a wild stretch to argue that the admission of White's testimony skewed the truth-seeking process, Roy again fails to show that the trial judge abused her discretion. And finally, the challenged testimony was no more than mildly leading. It was not the typical putting of words into the mouth of a witness that is the danger sought to be avoided by limiting leading questions. White, of course, was an intelligent witness. To say that when he was asked—

Q  Were you offended or insulted by Mr. Roy's conduct?

A  Well, yes, I was offended.

Q  Had you ever been subjected to conduct like this by anyone from the Austin Company?

A No, ma'am.

Q Had you ever heard anyone else from the Austin Company ever refer to you personally in a derogatory manner or use profanity directed toward you?

A No, ma'am.

Q Did you tell Mr. Melsop in the telephone call that you referred to earlier that Mr. Ranjit Roy had called you—and please excuse my language—a fucking bastard?

A Yes, ma'am.

Q And did you tell Mr. Melsop in that same telephone conversation that you were unhappy with and offended by Mr. Roy's conduct?

A Yes, ma'am.

—he was being improperly led by Austin's counsel into giving testimony that was not his own is silly.

The judgment is affirmed.