In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2877

EDIE F. and MICHAEL F., as parents
of and on behalf of their minor child,
CASEY F.,

Plaintiffs-Appellants,

v.

RIVER FALLS SCHOOL DISTRICT,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-C-354-C--Barbara B. Crabb, Judge.

Argued January 24, 2001--Decided March 8, 2001


 Before FLAUM, Chief Judge, and EVANS and WILLIAMS,
Circuit Judges.

 EVANS, Circuit Judge.  We're sure it's very
frustrating at times to be the parents of a child
with special needs. In this case, the parents of
a boy named Casey were apparently frustrated with
his school progress, so they turned to mediation
with the River Falls (Wisconsin) School District
over his individualized education plan. After
reaching a settlement, the parents filed this
suit for attorneys fees pursuant to the
Individuals With Disabilities Act (IDEA), 28
U.S.C. sec. 1400 et seq. District Judge Barbara
B. Crabb, however, found that the parents did
not, in the process, receive the kind of success
necessary to annoint them as "prevailing
parties," and so the fee request was denied. This
appeal followed.

 Casey was diagnosed with attention deficit
disorder (ADD), and he received special education
services for learning disabilities throughout his
tenure in grade school. In preparation for his
move to high school, the River Falls School
District had Casey reevaluated by a school
psychologist, a step prompted by increasing
concern over Casey's insubordination, aggressive
behavior, and frequent absences from school.

 In order to create an educational plan that
would address Casey's learning disabilities and
behavioral problems, the school convened a team

of educators, including the school's vice-principal, a counselor, two learning disability teachers, and three other teachers. We will delve into a bit of detail about the efforts to meet Casey's needs (several different plans are involved) because the response of the District, and the basis for Judge Crabb's decision to deny fees, is best understood in context.

Over the summer, before high school started, the District team formulated an individualized educational plan (IEP) for Casey. It was noted that Casey was functioning below grade level in reading and writing and that he required frequent monitoring. His emotional and social behavioral problems, however, were not thought to be severe enough to warrant placing him in an emotional disabilities program. Thus, the School District allowed him to remain in regular classes while attending learning disability study halls. Moreover, Casey received special consideration in his regular classes. He was given additional time to complete assignments and tests, he could have test questions read aloud, and he was given step-by-step written instructions in class.

In September 1996, shortly after Casey started high school, his mother wrote to Gerald Boock, the School District's director of special education, requesting a review of Casey's IEP. She also asked that the District employ an expert in ADD and hyperactivity to review Casey's program. Although Boock agreed to review the plan, he did not believe that an ADD specialist was necessary so early in the school year because Casey seemed to be doing OK during his first few months of high school.

Despite his initial resistance to an outside expert, Boock eventually brought in a special education director from another school district to review Casey's records and attend meetings that resulted in the creation of a revised plan for Casey's freshman year. Casey's parents and the District agreed on several modifications, including an additional 3 hours of learning disability services for spelling, math, and writing. Moreover, the school gave him additional counseling regarding his social skills. The revised plan also included a five-page list of short-term objectives consisting of tasks Casey was to finish, when they were to be completed, and what consequences would follow if he fell short of the goals. Finally, the parties agreed to appropriate disciplinary measures that would not interfere with his schooling, including early morning and in-school detentions, during which the school would provide additional learning disability services.

During the summer before his sophomore year, District officials and Casey's parents again met and approved a new individualized education plan for the year. In an effort to find subjects that might interest Casey more and motivate him to attend class, the District agreed to have him complete an interest inventory and take a variety of courses in subjects like art, mechanics, and food. The school also agreed to provide learning disability support in the form of tutoring, test modification, and increased monitoring for math and intermediate biology classes. As for disciplinary measures, he was to serve lunch detentions when he was tardy and be rewarded if he was on time for 3 days in a row.

Again, a list of short-term objectives was formulated, encouraging Casey not to miss more than 4 days per term, to take his prescription medication for ADD regularly, to reduce tardiness, and to complete assignments. The sophomore plan also focused on helping Casey make the transition from high school to work. He was offered a course in employability. The school agreed to help him find a job and, if employment was found, to adjust his school schedule so he could work part-time.

Again, within months of starting the school year, in October 1997, Casey's parents requested a review of the educational plan that they had helped formulate over the summer. Again the District agreed to review and modify the plan. As before, Casey's failure to attend classes, his negative attitude, and his poor work habits hampered his school performance. In an effort to set attainable goals, Casey's academic requirements were further reduced. In the second term of his sophomore year, 50 percent of his course work was to consist of PASS programs designed for mastering basic skills in segments, and he could work at his own pace with the help of a tutor. Similar reductions of regular classes and increased percentages of PASS programs were put into place for the third and fourth terms of the school year.

Moreover, at his mother's request, all punitive measures for missing school were removed from his sophomore program, and incentives--a point system with rewards--were added. In hopes of reducing absenteeism, Casey was encouraged to select courses of particular interest to him. He was enrolled in driver's education, physical education, pottery, food, and general mechanics along with hands-on versions of integrated math and word studies. For the latter two classes he received support from a learning disabilities teacher.

The District hoped that a combination of shortened school days, credit for out-of-school employment, high-activity courses, and self-selected subjects would motivate Casey to attend school more regularly. Finally, as part of his school-to-work transition, the District arranged for an evaluation with a representative from the state Department of Vocational Rehabilitation to perform a functional vocational evaluation and to help Casey formulate employment objectives, adult living goals, and daily living skills. Despite these modifications and incentives, Casey was absent from 60 percent of his classes during his sophomore year.

As it had done for the past two summers, in June 1998 the District began creating the third individualized educational program for Casey's junior year. With input from Casey's parents, the District agreed that Casey would continue with the PASS programs, working 1 hours per day with a certified teacher. In addition, he was to attend physical education classes for 85 minutes daily. Thus, including lunch, Casey would attend about 4 hours of school a day and be free to work off-campus for 3 hours. Casey's case manager found him a job at a grocery store.

Because Casey was still deficient in spelling, writing, math, and reading, the District also offered off-site private tutoring, which the parents rejected because Casey preferred to stay on campus with his friends. The District noted that Casey had earned no credits towards graduation during his sophomore year and that, despite several modifications to his school program intended to make school more appealing, he continued to frequently skip classes.

On June 4, 1998, Casey's parents wrote to the Department of Public Instruction, asking for a due process hearing to address Casey's failure to attend school and the school's inability to resolve this problem. In particular, Casey's parents requested an independent educational evaluation (IEE), a transition planning consultant, and modifications to Casey's individualized education plan that would capitalize on his strengths. His parents believed the current program was too punitive and failed to provide positive reinforcements.

After hearing of their request for a due process hearing, the District agreed to mediate the dispute with Casey's parents. Both sides retained counsel. After mediation, the District agreed to pay for an independent education evaluation and a transition consultant. On their part, Casey's parents agreed to release Casey's medical records, which the school had never had

access to before.

 The new IEE agreed with the diagnosis of the earlier evaluation, finding that Casey had been correctly diagnosed with attention deficit-hyperactivity disorder and problems with eye-hand coordination. The new evaluation also agreed with the overall educational methodology employed by the District and stressed the need for frequent feedback and effective medication management. The evaluator suggested that Casey be tutored off-campus to help him concentrate on his studies. Although the new evaluation stressed the need for setting limits and clearly identifying the consequences of negative behavior, it did not comment on the use of punitive measures or the incentive structure employed by the school.

 At the end of March 1999 the parties entered into a settlement agreement that incorporated the suggestions of the IEE into a new IEP. The modifications included a further reduction in the number of credits Casey would need to graduate and a more detailed list of classroom adjustments. The new plan continued to provide Casey with a short school day. To accommodate Casey's difficulty in getting up early, his first class was scheduled to begin at 9:40 a.m. and his day ended at 2:30 p.m. Finally, the School District offer of off-site tutoring, rejected the last time around, was offered again based on the independent evaluator's recommendation, and this time the parents agreed to allow Casey to be tutored off-campus in a one-on-one format.

 Unfortunately, despite all the efforts of the School District and Casey's parents, the new plan was ineffective. Casey worked at the grocery store for one day before quitting. He continued to cut classes, and even with significantly reduced educational requirements, failed to progress in school and, of course, graduate.

 We review a district court's decision to deny attorneys fees under the IDEA in a highly deferential manner. Monticello Sch. Dist. No. 25 v. George L., 102 F.3d 895, 907 (7th Cir. 1996). We will reverse the trial court's decision only for an abuse of discretion. Id. To find an abuse of discretion we must conclude that no reasonable person could agree with the ruling--that it was fundamentally wrong. Roy v. Austin Co., 194 F.3d 840, 843 (7th Cir. 1999).

 The IDEA provides that in any action or proceeding brought under the Act, "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. sec. 1415(i)(3)(B). Where the

parties have resolved their dispute voluntarily via settlement rather than litigation, we apply what we have called a two-prong catalyst rule. Krocka v. City of Chicago, 203 F.3d 507, 517 (7th Cir. 2000).

To win attorneys fees, parents must show: (1) that their lawsuit was "causally linked to the achievement of the relief obtained," and (2) that "the defendant must not have acted wholly gratuitously," namely, that plaintiffs' claim was not frivolous, unreasonable, or groundless. Zinn v. Shalala, 35 F.3d 273, 274 (7th Cir. 1994). To establish the first prong, those seeking attorneys fees must show more than "but for" causation; rather, their suit must have been a cause, "in the same sense in which we speak of 'cause' in tort and criminal law," enabling them to attain their litigious objectives. Brown v. Griggsville Cmty. Unit Sch. Dist. No. 4, 12 F.3d 681, 685 (7th Cir. 1993). Finally, a district court's determination of causation is a factual finding that we review only for clear error. Johnson v. Lafayette Fire Fighters Ass'n, 51 F.3d 726, 730 (7th Cir. 1995). Under this standard, we will not find a district court's choice between two permissible views of the facts to be clearly erroneous. United States v. Huerta, 2001 WL 87637, *4 (7th Cir. Ind.).

On appeal, the parents argue that their claim was not frivolous because the District was legally obligated to provide Casey with a second independent educational evaluation and that, by requesting a due process hearing, they were able to secure real educational benefits which would not have accrued without legal action. We doubt that this is true.

First, on the basis of this record, we do not believe Casey's parents were legally entitled to a second IEE because they did not significantly disagree with the first evaluation. Thus, the School District acted gratuitously in paying for an evaluation the second time around.

"A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. sec. 300.502(b)(1). Casey's initial IEE was conducted in May 1996 before he started high school. This evaluation affirmed a prior diagnosis that he suffered from ADD and hyperactivity. Based on this report, the School District, with his parents' input, created an IEP as required by the IDEA. In June 1998, when Casey's parents requested a due process hearing, they did not identify an area of disagreement with either Casey's diagnosis or the educational methodology used by the school.

Instead, they expressed frustration over Casey's frequent absences, noting that in the past year he had spent more time out of school than in. They complained that Casey had not "been successful in his current placement," and that the school staff had not taken the initiative to capitalize on his strengths, but rather had relied excessively on punitive measures. They requested new approaches to an old problem.

Citing Board of Education of Murphysboro v. Illinois Board of Education, 41 F.3d 1162 (7th Cir. 1994), the parents argue that to be entitled to a new evaluation they need only show that they disagreed with the nature and extent of special education and related services provided for Casey. In that case, the school district favored mainstreaming disabled children with nondisabled students to promote modeling, and the parents of the disabled child disagreed, arguing that their child's language skills were regressing under mainstreaming. Id. at 1165. Here, there is no such disagreement. Rather, Casey's parents wanted something done about his absences and objected to the use of punitive measures. As for the lack of incentives, the School District had already addressed that issue in October 1997 when, at the request of Casey's mother, it removed all punitive measures and added positive reinforcements to his program. Moreover, the new IEE made no mention of punitive measures even though this was one of the two issues that prompted Casey's parents to request a due process hearing in the first place. Thus, the new IEE did not identify the incentive structure as a deficiency in Casey's IEP.

In requesting a new IEE, Casey's parents were not advocating an alternative approach which the school refused to accept, nor were they opposing an existing methodology. What they disagreed with were the results of the educational plan, not the diagnosis or the rehabilitative process. They wanted more and better. They wanted their child to succeed, to attend school regularly, and to gracefully transition from school to work. A laudable aim, but not one that is mandated by the IDEA. What the IDEA provides are procedural protections to ensure that parents have a voice in the education of their special-needs children. It does not, and cannot, guarantee particular results. Thus, plaintiffs' claim for attorneys fees cannot rest on the fact that the District agreed to pay for a second IEE. Krocka v. City of Chicago, 203 F.3d 507, 518 (7th Cir. 2000) ("Where a plaintiff has 'obtained benefits to which we now know he was never entitled,' the granting of that relief does not provide grounds for awarding attorney's fees.") (quoting Hunger v. Leininger, 15 F.3d 664, 670 (7th Cir. 1994)).

Plaintiffs also charge that in 1997 they repeatedly asked for an IEE and received one only after they requested a due process hearing, thus establishing that they were the prevailing party in mediation. However, repeating a groundless claim does not increase its legitimacy. The parents were not entitled to a second IEE in 1997 or in 1998 when they requested a due process hearing.

Even were we to find that Casey was entitled to a second IEE at state expense, this relief would not warrant an award of attorneys fees. As we have stated before, an award of attorneys fees for a grant of interim relief would be wrong. Hunger, 15 F.3d at 670. The second IEE was just such relief. It had no inherent, stand-alone value. It did not disagree with the prior evaluation, nor did it chart a new course or provide new insights on how to craft a successful educational plan for Casey. Jodlowski v. Valley View Cmty. Unit Sch. Dist., 109 F.3d 1250, 1254 (7th Cir. 1997) (reversing attorneys fees award, where parent obtained independent evaluation at public expense, reasoning that IEE was "species of interim relief," had no intrinsic value, and merely facilitated child's reentry into school). Such interim relief cannot create a right to attorneys fees.

Rather, the second IEE served to affirm that the School District had correctly assessed Casey's condition and implemented an appropriate IEP. The second IEE did not dispute the findings of the initial IEE. The only substantive--and marginal at that--change was that after the second IEE, Casey was tutored off-campus. This option, however, had been offered to Casey's parents in the summer of 1998, before his junior year. The parents cannot now claim that by requesting a due process hearing they forced the District to give them an adjustment they rejected months before.

Finally, we consider the District's decision to provide a transition consultant and to further modify Casey's IEP. Plaintiffs argue that these changes constituted real educational benefits for Casey that the District would never have agreed to had they not requested a due process hearing. We leave aside the issue of whether these modifications amounted to real educational benefits or just a third round of tweaking. Instead, we turn to the issue of causation and agree with Judge Crabb's factual finding that the plaintiffs failed to establish that their request for a hearing caused these modifications. Twice, in Casey's freshman and sophomore years, his parents requested a review of his educational plans, and the District agreed, making

substantive changes on both occasions. Nothing in the record indicates that this level of cooperation would not have been repeated a third time. Nonetheless, the parents insist that without mediation the modifications would not have occurred. At best, this is "but for" causation, and as we have stated before, an award of attorneys fees requires more. Brown v. Griggsville Cmty. Unit Sch. Dist. No. 4, 12 F.3d 681, 685 (7th Cir. 1993). Here, Casey's parents resorted to litigation, calling in attorneys even though they did not disagree about most substantive issues and had no meaningful independent or contrary recommendations. Moreover, they repeatedly participated in formulating the educational plans that they later found wanting. Clearly, as parents they have a right to champion their son's cause, but the right to have their attorneys fees picked up by the taxpayers is more circumspect.

 Where, in an effort to appease frustrated parents, a school district provides services that are not required by law, an award of attorneys fees adds injury to injury. Brown, 12 F.3d at 684. We do not want to discourage school districts from being cooperative, creative, and responsive, as we think the River Falls District was here. By awarding attorneys fees when districts settle disputes by gratuitously providing additional services, we would be doing just that. Here, the parents and the District repeatedly revised Casey's independent educational plans in hopes of encouraging him to do better. Despite their best efforts, the plans were unsuccessful. Although this creates a frustrating situation, it does not entitle Casey's parents to claim prevailing party status, so the judgment of the district court is

AFFIRMED.